**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

*David E. Patton*
*Executive Director*
*and Attorney-in-Chief*

Southern District of New York
Jennifer L. Brown
Attorney-in-Charge

February 22, 2023

**BY ECF AND HAND DELIVERY**
Honorable Denise L. Cote
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   **United States v. Chet Stojanovich,**
      **22 Cr. 339 (DLC)**

Dear Judge Cote:

Chet Stojanovich is a 38-year-old man with no criminal history; he has accepted responsibility for a wire-fraud offense and will appear before this Court for sentencing on March 2, 2023. Mr. Stojanovich suffers from poor health, both physically and mentally, which both mitigates his offense and makes imprisonment unduly severe and detrimental in his case. In light of these factors—and the significant progress that Mr. Stojanovich has made in treatment since his arrest—the parsimonious sentence in this case is the one month in BOP custody and eight months on home detention that Mr. Stojanovich has already served, plus a term of supervised release with appropriate conditions.

## BACKGROUND

Regarding Mr. Stojanovich's personal history, I can do no better than to refer the Court directly to his brother Paul's detailed and insightful four-page letter, which is attached as **Exhibit A** to this memorandum and will not be repeated herein. Mr. Stojanovich has the following salient personal characteristics that are relevant to sentencing.

First, Mr. Stojanovich has a good character and no criminal history. He is a gentle and generous man "who goes out of his way to help others out of the kindness of his heart." **Exhibit B** (Letter of Tamsin Measroch) (providing examples). He is "a real gentleman, with a golden heart and compassion for others." **Exhibit C** (Letter of Jeff Measroch). "Over and over again, I watched Chet take other patients under his wing, care for them, and invest his time and energy in them." **Exhibit D** (Letter of Rebecca Hatcher) ("One of the residents had no means of buying groceries for herself and nothing to eat except breakfast cereal. Chet cooked dinner for her, and anyone else who was hungry almost every night, even with limited means.").

Honorable Denise L. Cote                                    February 22, 2023
United States District Judge                                    Page 2 of 12

    <u>Second</u>, Mr. Stojanovich's life has been shaped by illness and tragedy.  His mother suffered from uncontrolled bipolar disorder and alcoholism; she left the family when Mr. Stojanovich was an infant and made only infrequent and traumatic appearances during his childhood.  Mr. Stojanovich's father was a kind, loving, and talented man who raised Chet and his older brother Paul single-handedly while also pursuing a successful television career.  But his life was cut short in March 2003, when Mr. Stojanovich was a teenager: he disappeared on a hike along a cliff in Oregon and his body was later recovered from the Pacific Ocean.

    Mr. Stojanovich inherited two illnesses that run in his family: bipolar I disorder (which is characterized by more severe manic episodes than bipolar II disorder) and Charcot-Marie-Tooth disease ("CMT"), also known as hereditary motor and sensory neuropathy, which causes pain, weakness, atrophy, foot deformities, and loss of feeling and muscle control.  (He also suffers from generalized anxiety disorder and posttraumatic stress disorder.  <u>See</u> **Exhibit E** (Letter of Eric Burk, LMFT).)  Mr. Stojanovich was diagnosed with both CMT and bipolar I disorder in adolescence and received treatment for both at that time.  His CMT first affected his feet, necessitating corrective foot surgeries.  For his bipolar disorder he was prescribed lithium and Ritalin and underwent inpatient and outpatient treatment.  But lithium exacerbated the CMT symptoms, and ultimately the young and parentless Mr. Stojanovich focused on treating his palpable pain and convinced himself that he did not have mental health problems that required attention.

    Over the years, Mr. Stojanovich was prescribed increasing levels of opioid pills to manage his CMT-related pain.  By the time of his arrest in April 2022, he was taking, each day, eight Percocet tablets of 10mg oxycodone and 325mg acetaminophen and two 60mg morphine sulfate pills, as well as diazepam for muscle spasms and a topical neuropathic pain cream containing lidocaine and ketamine.  He was not taking any medication for his bipolar disorder.

    Mr. Stojanovich's bipolar I disorder and opioid dependency provide mitigating context for his wire-fraud offense.  Mr. Stojanovich's offense is described in extended detail in the PSR and will not be repeated herein.  In broad strokes, Mr. Stojanovich started a company to engage in cryptocurrency mining, promised to obtain and host cryptocurrency mining computers for customers, took money from them promising to purchase computers, failed to obtain and provide most of the promised computers or to return the money, and lied about it.  Mr. Stojanovich's offense is undoubtedly serious; it occurred over an extended period and resulted in a loss of about $2.1 million.[1]  It is mitigated because Mr. Stojanovich did not set out with the purpose of

---

[1] The correct restitution amount is likely lower than that set forth in the PSR because Mr. Stojanovich spent some of the money that was supposed to go to buying mining computers on buying mining "hash power" from others' mining computers in an online marketplace, in what the

Honorable Denise L. Cote                    February 22, 2023
United States District Judge                       Page 3 of 12

defrauding people.  He rather sincerely believed that he would be building a
successful bitcoin operation using cheap, green hydroelectric power from Canada.
The big plans, big promises, and big expenditures he made bespeak mania.  See Ex.
A at 2 ("[W]hen my brother was involved with Bitcoin mining, he was demonstrably
exhibiting the most obvious symptoms of mental illness.  The one time I stayed with
him just before the pandemic arrived, he told my girlfriend that his goal in life was
to be the world's first trillionaire.")  When his plans crashed to Earth and he was
unable to fulfill his promises, Mr. Stojanovich lied to cover it up.  There is no excuse
for these lies, but it is mitigating that his judgment was clouded by depression and
opioid dependency.

    Third, Mr. Stojanovich is remorseful for his offense and is on the road to
recovery.  He has come a long way since his arrest on April 18, 2022.  At that time,
he was disheveled and obviously unwell.  He was seeking opioids and did not accept
any responsibility for his offense.

    Mr. Stojanovich's brother, Paul, made the hard decision not to co-sign his
brother's personal recognizance bond until a bed in a residential substance-abuse
treatment program could be secured.  At that time, Paul believed that opioid
dependency was the principal issue.  Chet did not succeed in his first placement, at
Sierra Tucson, probably because he did yet believe he needed help.  He was
terminated from that placement and nearly remanded by this Court.  The stress of
that episode precipitated a psychotic break.  Paul writes:

> When I picked him up, I discovered that they were still treating my
> brother with opioids, which I thought was nothing short of medical
> malpractice. The only thing they had left my brother with was an
> address for a pharmacy to pick up opioids. My patience had been
> exhausted, my limits tested, and my anger was explosive. There was
> simply no way I was driving 40 miles to pick up the very substance that
> had played a seminal role creating these circumstances in the first place.
> Shortly after departing the facility, my brother had a full psychotic
> episode, not unlike the very worst I had seen from my grandmother.
> From my mother. He nearly leapt from the car at 80 MPH on a scorched
> Arizona highway. I truly had no idea what to do, so we pulled over. I
> knew that I couldn't explain this adequately, so I recorded a video
> capturing a portion of his psychotic episode. He was a terrified, helpless,

---

government has characterized as a "lulling" tactic to conceal the fraud.  From this hash power,
customers received some cryptocurrency, which would reduce their out-of-pocket loss.  However, due
in part to the probabilistic nature of the conversion of computing hash power into cryptocurrency, we
have been unable to quantify this offset.  Mr. Stojanovich therefore agrees to the restitution amount
set forth in the PSR.

Honorable Denise L. Cote                                      February 22, 2023
United States District Judge                                      Page 4 of 12

a scared little boy. I wondered what my dad would've done for him. I
tried my best.

Ex. A at 3.

After an admission to a psychiatric hospital, Chet returned to inpatient
treatment and later successfully graduated to outpatient treatment.  He has come
to engage fully in treatment and has made substantial progress.  See Ex. D & E.
He has not taken any opioid pain medication since he left Sierra Tucson in June
2022.  Instead, he takes psychiatric medications for his bipolar I disorder, anxiety,
and PTSD.  These medications have been adjusted over time as Mr. Stojanovich
works with psychiatrists; currently he takes Vyvanse, propranolol, diazepam,
lamictal, and Zofran.

Mr. Stojanovich's psychotherapist at TRUST SoCal, Eric Burk, describes
Chet's progress in his letter to the Court:

> [Mr. Stojanovich] has come to accept that he does in fact have bipolar
> disorder and has been fully cooperative with his team's efforts to teach
> him the skills necessary to manage it. He has learned to recognize the
> early warning signs of an impending manic episode as the illness
> manifests in him, and has developed a game plan for what to do if any
> of these warning signs are observed – what to do, who to call and in what
> order, etc. This is a critical skill that will enable him to limit the severity
> of future manic episodes and possibly avoid them altogether. He also
> acknowledges the importance of consistently taking whatever
> medications his doctor prescribes to stabilize his mood and makes no
> changes in his med regimen without consulting his doctor and obtaining
> his approval.

Ex. E at 1.  Mr. Stojanovich's TRUST SoCal group counselor, David Deranian,
similarly advises that Mr. Stojanovich has made positive changes in his daily life
since beginning treatment and is pleasant to have in the group setting.

In Paul's estimation, "Chet found a psychologist that was able to get him to
surrender to his diagnosis."  Ex. A at 4.  Now, Paul writes,

> [Chet] is on time to everything. He's free of opioids. Underneath all of
> Chet's mental illness, is a kind of brilliance, not unlike my father's. The
> change from the day he was taken into custody in late April to now is
> measurable. He's coherent. He's humble. He's honest. And for the first
> time in as long as I can remember, he's sober. He's my brother again.

Id.

Honorable Denise L. Cote                     February 22, 2023
United States District Judge                      Page 5 of 12

As Mr. Stojanovich's mental health has improved, so too has his insight into his offense.  He accepts responsibility and expresses remorse.  He is committed to leading a good life moving forward and to helping others.  Given the new lease on life that treatment has provided him, he is interested in giving back by becoming a treatment counselor himself.  He has taken the first steps to complete his education for that purpose.

## THE APPROPRIATE SENTENCE

"In deciding what sentence will be 'sufficient, but not greater than necessary" to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain."  United States v. Singh, 877 F.3d 107, 121 (2d Cir. 2017) (second internal quotation marks omitted).

In the unique circumstances of this case, the Court can craft a sufficient sentence without returning Mr. Stojanovich to prison.  In light of Mr. Stojanovich's mitigating personal history and characteristics, including mental and physical health issues, the Court should impose a sentence of time served—which reflects just over one month of incarceration at MDC Brooklyn and eight months of home detention—plus supervised release with appropriate special conditions to include treatment, community service, and perhaps additional home confinement.

**The advisory Guidelines range does not merit deference.**

As an initial matter, the Court owes no deference to the advisory Guidelines range of 41–51 months.  See generally Gall v. United States, 552 U.S. 38, 50 (2007) (courts "may not presume that the Guidelines range is reasonable").

The Second Circuit has recognized the broad discretion afforded to courts in dealing with financial crimes, holding that even with a particular amount of loss, "different sentences [are warranted] based on the factors identified in § 3553(a). United States v. Cavera, 550 F.3d 180, 192 (2d Cir. 2008) (en banc)).  It has also indicated that the overwhelming focus on the loss amount in such cases should lead courts to consider non-Guidelines sentences.  United States v. Algahaim, 842 F.3d 796, 800 (2d Cir. 2016); see also United States v. Adelson, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006), aff'd, 301 Fed. Appx. 93 (2d Cir. 2008).

The Supreme Court has recognized that not all Guidelines are created equal: while some "exemplify the Commission's exercise of its characteristic institutional role," others do not.  Kimbrough v. United States, 128 S. Ct. 558, 575 (2007).  If a particular guideline was originally based on past sentencing practices and revised in response to sentencing data and other research, then it seems fair to assume that recommendations truly embody the statutory goals of § 3553(a).  Rita v. United

Honorable Denise L. Cote                                      February 22, 2023
United States District Judge                                        Page 6 of 12

States, 551 U.S. 338, 349 (2007).  Conversely, when a guideline is not developed
according to this practice, there is less reason to believe it embodies those goals and
deserves such deference, even in a mine-run case.  Kimbrough, 552 U.S. at 109.

Section §2B1.1 is an example of one guideline that is not based on historical
sentencing practices or research, but rather is singularly focused on the overall loss
amount.  As the Second Circuit explained,

> the Commission could have approached monetary offenses quite
> differently.  For example, it could have started the Guidelines
> calculation for fraud offenses by selecting a base level that realistically
> reflected the seriousness of a typical fraud offense and then permitted
> adjustments up or down to reflect especially large or small amounts of
> loss.  Instead the Commission valued fraud (and theft and
> embezzlement) at level six, which translates in criminal history category
> I to a sentence as low as probation, and then let the amount of loss, finely
> calibrated into sixteen categories, become the principal determinant of
> the adjusted offense level and hence the corresponding sentencing
> range.  This approach, unknown to other sentencing systems, was one
> the Commission was entitled to take, but its unusualness is a
> circumstance that a sentencing court is entitled to consider.

Algahaim, 842 F.3d at 800.  The Second Circuit has invited District Courts to
consider non-Guidelines sentences in economic-harm cases for this reason.  See id.
(where "Commission has assigned a rather low base offense level to a crime and
then increased it significantly by a loss enhancement, that combination of
circumstances entitles a sentencing judge to consider a non-Guidelines sentence");
see also, e.g., United States v. Gupta, 904 F. Supp. 2d 349 (S.D.N.Y. 2012)
(describing how the Guideline effectively ignore everything but the loss amount and
that many of the resulting Guidelines-recommended sentences are "irrational on
their face"); United States v. Ovid, 09 Cr. 216 (JG), 2010 WL 3940724, at *1
(E.D.N.Y. Oct. 1, 2010) (criticizing § 2B1.1).

More generally, the history of §2B1.1 shows the loss guideline to lack any
sound policy rationale.  It was not based on empirical research concerning deterrent
efficacy or any other variable relevant to the purposes of sentencing.  It was not
even originally intended as a codification of past sentencing practices.  To the
contrary, it was written with the goal of increasing the severity of sentences over
historic levels.  See United States v. Corsey, 723 F.3d 366, 379 (2d Cir. 2013)
(Underhill, J., concurring). ("The loss guideline . . . was not developed by the
Sentencing Commission using an empirical approach based on data about past
sentencing practices.  As such, district judges can and should exercise their
discretion when deciding whether or not to follow the sentencing advice that
guideline provides.").

Honorable Denise L. Cote                                           February 22, 2023
United States District Judge                                           Page 7 of 12

## Courts typically impose below-Guidelines sentences in fraud cases.

In light of the criticism surrounding the fraud guideline, it is not surprising that statistics provided by the Sentencing Commission find that courts most often give below-Guidelines sentences in fraud, theft, and embezzlement cases. Judges in this District imposed Guidelines sentences in less than 20% of fraud, theft, and embezzlement cases in fiscal year 2021. See U.S. Sentencing Commission Statistical Information Packet for Fiscal Year 2021, Southern District of New York at Table 10.[2]

The Sentencing Commission's interactive data analyzer, available at https://ida.ussc.gov/, gives additional insight into the types of sentences that Judges in this District have imposed in fraud, theft, and embezzlement cases from 2015 through 2021.[3] For defendants, like Mr. Stojanovich, who are in Criminal History Category I and Zone D of Guidelines Table, fully 65% of sentences are 24 months or less:

---

[2]      Available      at      https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/nys21.pdf

[3] The data analyzer is a more appropriate tool than the new Judiciary Sentencing Information platform ("JSIN") for this purpose because it covers more years and can be focused by district, while the JSIN contains only aggregate national data. Southern District of New York sentences appear to be lower than the national average, perhaps because the Second Circuit Court of Appeals has invited District Judges to vary from the Guidelines in fraud cases as discussed above. In any event, the JSIN establishes that below-Guidelines sentences are the norm nationally for a non-cooperating fraud defendant with Mr. Stojanovich's Guidelines offense level and Criminal History Category. See generally https://jsin.ussc.gov/.

Honorable Denise L. Cote                                    February 22, 2023
United States District Judge                                        Page 8 of 12



**Distribution of Sentence Length**
Fiscal Year 2015,2016,2017,2018,2019,2020,2021

The figure includes the 997 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of probation only are included here as zero months.
FILTER:
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021; Circuit: All; State: All; District: New York, Southern; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Fraud/Theft/Embezzlement; Guideline: §2B1.1; Drug Type: All; Sentencing Zone: D; Criminal History: I; Career Offender Status: Exclude Career Offenders

In this District, the mean sentence in this category (Criminal History Category I, Zone D) is 24 months, and the median sentence is 15 months.  Excluding sentences of probation, the average length of a sentence of imprisonment is 25 months and the median length of a sentence of imprisonment is 18 months.





Honorable Denise L. Cote                                    February 22, 2023
United States District Judge                                  Page 9 of 12

**Mr. Stojanovich should be sentenced below the 15-month median sentence
imposed on fraud offenders in his Criminal History Category and Zone.**

     Mr. Stojanovich's sentence should be below the median sentence of 15 months
imposed in this District on fraud offenders in Criminal History Category I and Zone
D of the Guidelines table.

     <u>First</u>, Criminal History Category I overstates Mr. Stojanovich's criminal
history because it includes not only defendants, like Mr. Stojanovich, who have
never been arrested before; it also includes defendants with criminal history who
have reoffended after a lenient sentence or an old sentence.  Courts have recognized
that a greater sentence is required for someone who reoffends than for a first-time
offender.  <u>See</u>, <u>e.g.</u>, <u>United States v. Mishoe</u>, 241 F.3d 214, 220 (2d Cir. 2001)
(recognizing in the context of the career offender guideline that the amount of prior
prison time is relevant to determining the deterrent effect of the sentence to be
imposed); <u>see also</u>, <u>e.g.</u>, <u>United States v. Baker</u>, 445 F.3d 987, 992 (7th Cir. 2006)
(affirming below-Guidelines sentence on government's appeal, and approving of "the
district court's finding that a prison term would mean more to Mr. Baker than to a
defendant who previously had been imprisoned") (citing § 3553(a)(2)(A)–(B)).

     <u>Second</u>, Zone D is a very broad zone, spanning, in Criminal History
Category I, from offense level 14 all the way to offense level 43.  At offense level 22,
Mr. Stojanovich in in the bottom third of that zone.

     <u>Third</u>, Mr. Stojanovich presents with unusually mitigating history and
characteristics.  Of particular note are his physical and mental illnesses which
contributed to his offense.  Mr. Stojanovich has worked hard to address these issues
constructively while on bail; it would be very difficult for him to manage them in
prison.

**Mr. Stojanovich poses a low risk of recidivism.**

     With respect to the sentencing purposes of punishment and specific
deterrence, § 3553(a)(2) & (3), the Court should consider that Mr. Stojanovich poses
a low risk of recidivism.[4]

     Generally, as a matter of statistics, a fraud offender with no criminal history
presents a low risk of recidivism.  Empirical study by the U.S. Sentencing

---

[4] With respect to "general deterrence," Department of Justice research has concluded that "sending
an individual convicted of a crime to prison isn't a very effective way to deter crime" in general.
National Institute of Justice, Five Things about Deterrence (2016), <u>available at</u>
<u>https://www.ojp.gov/pdffiles1/nij/247350.pdf</u>.  Similarly, "[i]ncreasing the severity of punishment does
little to deter crime." <u>Id.</u>  Research shows that it is "[t]he *certainty* of being caught is a vastly more
powerful deterrent than the punishment." <u>Id.</u> (emphasis in original).

Honorable Denise L. Cote
United States District Judge

February 22, 2023
Page 10 of 12

Commission indicates that Mr. Stojanovich's lack of criminal history and offense type by themselves, place him among the very least likely to reoffend.  See U.S. Sentencing Commission, "Recidivism Among Federal Offenders: A Comprehensive Overview," at 18, 20 (2016) ("2016 Recidivism Report").[5]  "For example, 30.2 percent of offenders with zero total criminal history points were rearrested within eight years, compared to 81.5 percent of offenders with more than 10 total criminal history points."  Id. at 18.  Defendants whose federal offense involved larceny or fraud were less likely to reoffend than those with other categories of offense.  Id. at 20.  The Commission did not find a strong correlation between the Guidelines offense level and the risk of future recidivism.  Id.

Several factors further reduce Mr. Stojanovich's specific risk of recidivism. Intrinsic factors include Mr. Stojanovich's remorse and his engagement and progress in treatment.  Through treatment, he is addressing issues that contributed to his offense, specifically his use of opioids and his bipolar I disorder.  See Ex. E at 1 (explaining that Mr. Stojanovich's treatment at TRUST SoCal has focused primarily on his bipolar disorder because it is characterized by problematic manic episodes and anosognosia).  Mr. Stojanovich "has learned to recognize the early warning signs of an impending manic episode as the illness manifests in him, and has developed a game plan for what to do if any of these warning signs are observed."  Id.  He has also been chastened by his arrest and prosecution in this case:  "[T]he experiences Mr. Stojanovich has had over the past year – wearing a GPS monitor, having his movements severely restricted, being unable to work, and facing the prospect of going back to prison – have been highly distressing to him." Id. at 2 (noting that Mr. Stojanovich has gained insight into his offense behavior and opining that he is unlikely to reoffend).

In addition, extrinsic factors will prevent Mr. Stojanovich from being in a position where he would have the opportunity to commit a similar fraud.  They include that public fact of Mr. Stojanovich's conviction, which was the subject of a U.S. Attorney's Office press release, and the supervision, forfeiture, and restitution that the Court will impose.

**Any further term of imprisonment would fall especially hard on Mr. Stojanovich, given his physical and mental health issues.**

With respect to the sentencing purposes of punishment and rehabilitation, § 3553(a)(1) & (4), imprisoning Mr. Stojanovich for any length of time would be especially severe given his physical and mental health issues.

---

[5] Available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.

Honorable Denise L. Cote                                    February 22, 2023
United States District Judge                                   Page 11 of 12

Physically, Mr. Stojanovich's CMT causes him extreme pain, with which he is
struggling to cope since he went off opioid pain medication.  It is a progressive
disease that requires exercise and physical therapy.  If Mr. Stojanovich were to be
removed from his twice-weekly physical therapy and again placed in prison
conditions, he will endure the added and irreparable harm of neurogenic muscle
atrophy, which cannot be undone.

Mentally, too, imprisonment would be "highly detrimental" to Mr.
Stojanovich.  Ex. E at 2.  Mr. Burk explains:

> Mr. Stojanovich is diagnosed not only with bipolar I disorder but also
> anxiety disorder and PTSD. He suffers from nightmares, hypervigilance,
> hypersensitivity, and dissociative episodes related to the month he spent
> in federal custody in Brooklyn. He has severe anxiety that sometimes
> escalates into panic attacks. I have 23 years of experience working
> exclusively with clients diagnosed with severe and persistent mental
> illnesses, and it is my opinion that Mr. Stojanovich will forfeit most or
> all of the gains he has made in treatment and regress further if he is
> removed from treatment and returned to prison.

Id.

The termination of Mr. Stojanovich's physical and psychological therapy
would be contrary to the sentencing purpose "to provide the defendant with needed
educational or vocational training, medical care, or other correctional treatment in
the most effective manner."  § 3553(a)(2)(D); see also 18 U.S.C. § 3582(a)
("recognizing that imprisonment is not an appropriate means of promoting
correction and rehabilitation").

**The Court can fashion a sufficient sentence without returning Mr.
Stojanovich to BOP custody.**

Finally, returning Mr. Stojanovich to prison would be greater than necessary
under § 3553(a) because the Court can fashion a sufficient noncustodial sentence.
Mr. Stojanovich comes to sentencing having already spent one month at MDC
Brooklyn and eight months on home confinement.  Mr. Stojanovich will also lose
valuable civil rights as a result of this first felony conviction.  See generally United
States v. Nesbeth, 188 F. Supp.3d 179, 182 (E.D.N.Y. 2016) ("Today, the collateral
consequences of a felony conviction form a new civil death.  Convicted felons now
suffer restrictions in broad ranging aspects of life that touch upon economic,
political, and social rights.").

The Court has the power to impose additional home confinement and
community service as conditions of supervised release.  The Court can thereby

Honorable Denise L. Cote
United States District Judge

February 22, 2023
Page 12 of 12

achieve just punishment even as it supports Mr. Stojanovich's rehabilitation by allowing him to continue with his outpatient treatment.  See generally Gall v. United States, 552 U.S. 38, 48 (2007) (approving non-Guidelines probationary sentence in light of the "substantial restriction of freedom involved in a term of supervised release or probation.").  Home detention in particular is such a significant restriction on a person's liberty that both Congress and the Sentencing Commission have equated it with imprisonment.  See 18 U.S.C. § 3563(b)(19) (home detention may be imposed  as a condition of probation "only as an alternative to incarceration"); U.S.S.G. § 5C1.1 (e) (3) ("Schedule of Substitute Punishments") (if giving a non-incarceratory sentence, one day of home detention is equal to one day of imprisonment); § 5F1.2 ("Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment."); see also United States v. Fiume, 643 F. App'x 25, 28 (2d Cir. 2016) ("Home detention is a distinct condition that is significantly more onerous than GPS monitoring.").

## CONCLUSION

Mr. Stojanovich is remorseful and has already been thoroughly chastened by his arrest, month in prison, and eight months on home detention.  He has been doing good work in treatment and making changes that will alter the course of his life for the better.  Under these circumstances, it would be greater than necessary to send him back to prison.  The Court should instead fashion a sentence of supervised release with appropriate conditions.

Respectfully submitted,

/s/
Clay H. Kaminsky
Assistant Federal Defender
Federal Defenders of New York
(212) 417-8749

cc:   AUSA David Lewis
      Chet Stojanovich

# EXHIBIT A

February 15, 2023

Honorable Denise L. Cote
United States District Judge
500 Pearl Street
New York, NY 10007

Dear Judge Cote,

I love my little brother more than any person in my life. We are bound by blood, tragedy and love no matter the circumstances. He's truly the only person that can understand why I am who I am, and it cuts both ways. So the day I found out he had been taken into federal custody, it shook me to the core. The journey from that day until this present moment has tested every aspect of my character, his character and what remains of an already fractured family.

It's impossible for me to speak honestly about my brother without providing an origin story, because without context about our family, there's no chance of understanding Chet's identity. It's largely a Shakespearean tale marked by mental illness, tragedy and love. But our story must begin with the central figure whose shadow still weighs heavily over both of our lives, our father, Paul Stojanovich Sr.

My father was a pioneering television producer who produced law enforcement reality shows. He raised me and Chet alone, and we spent much of our childhood on the road watching him produce episodes of Cops and American Detective. It took herculean strength to create and produce television that reached hundreds of millions of people from around the world, and simultaneously make his two sons the priority in his life, the two people he cared about most. He used to say, "I love you infinity times infinity" or "I'm going to squeeze the love out of little Chetito." The only certainty Chet and I had in our lives was that our father would literally do anything for us. He was the bedrock of our existence. And when you factor in that our mother divorced our father before I was two, and before Chet even had his first birthday, it's not difficult to understand how much we depended upon him for survival, for love, for happiness. For our identity.

When he fell off a 375 foot cliff into the Pacific Ocean on March 15th, 2003, literally the Ides of March, you can imagine how much that radically upset the balance of our lives. We were still teenagers. Struggling to find purpose. After that day, nothing would be the same. Scars don't heal. We just notice them less.

Our mother has bi-polar disorder and is a recovering alcoholic. She entered our lives sporadically as kids, almost always in traumatic fashion. I remember her getting arrested on back-to-back Thanksgivings when I was three and four. Assaulting our nanny. Breaking into our home. Stealing all my father's girlfriend's clothes and setting them on fire. I personally didn't speak with her for 17 years after my father's funeral, not until she had experienced over a decade of sobriety.

My father's mother was a wonderful woman, the first woman to work at the Center for Disease Control. But after my father was born, she began exhibiting the worst levels of schizophrenia imaginable. My father's father, a world-renowned scientist, who met my grandmother while working at the CDC, suffered from alcoholism. When my father would leave us with our nanny and grandparents for work, both of us experienced innumerable chaotic events and schizophrenic episodes. It wasn't all bad though. They loved us deeply and were objectively brilliant people, but a conventional upbringing it was not.

It's also critical to know that my mother's mother suffered from borderline personality disorder, and our mother's father had Charcot Marie Tooth Syndrome, the same disease afflicted on my brother. Chet's genetic roll of the dice has inflicted immeasurable suffering on his life. In high school, he had to have full reconstructive surgery on each of his hands and feet, leaving him in a wheelchair for almost a year. His bi-polar disorder was no less merciless. He spent almost a year at the Menninger Psychiatrist facility. First, before my father died, and again afterwards.

During the beginning of the pandemic, I was forced to consolidate our family storage lockers as a matter of fiscal constraints. It forced me to undergo a Citizen Kane-like forensic examination of my father's life, something I had resisted for almost 20 years because of all the trauma associated with his legacy. Diaries. Photo albums. 8mm films. And then I discovered a seven-page letter he wrote to my brother less than a month before he died. Chet never read it because he didn't know it existed.

The letter was meant to give Chet the advice my father wished he had properly articulated while he was still alive. It shattered me to read it. He was in so much pain. One of the things he zeroed in on was that he too thought that he suffered from bi-polar disorder. There's was no question he experienced severe depression, but he cited the polarity he experienced as something of a gift. It gave him extraordinary creative insights. A true visionary. Courage. I'd say even too much. My father took a baseball bat to the head working as a news cameraman while covering a riot after the San Francisco 49ers won the Super Bowl. Chet and I were young kids. He was never the same for the rest of his life. He couldn't sleep properly, and it increased his appetite for risk, whether it be chasing dangerous criminals or stumbling onto a tree that dangled off a cliff into the Pacific Ocean.

What I know for sure is that he would die a thousand deaths if he hadn't had the opportunity to express what he said to Chet in this letter he wrote before he died. Knowing that my brother ended up on the wrong side of the very justice system my father spent his entire adult life telling stories about. Highlighting law enforcement heroes around the world. This I can say with complete certainty, there is zero chance any of this would have happened had my father not died.

I have no interest in discussing Chet's case. I've been a vocal opponent of crypto since well before the shameless ponzi scheme reached the cultural zeitgeist, empowering a generation of charlatans, megalomaniacs, con-artists and morally debased characters that define its culture. I call them the Bastard Children of Steve Jobs. But I will say, that when my brother was involved with Bitcoin mining, he was demonstrably exhibiting the most obvious symptoms of mental illness. The one time I stayed with him just before the pandemic arrived, he told my girlfriend that his goal in life was to be the world's first trillionaire. His lies were objectively disconnected

from anything resembling reality. To make matters worse, he had been in the throes of a full-blown opioids addiction that was compounded by liberal "pain management specialists," which is why, on that terrible day I found out my brother had been taken into federal custody, I had a sliver of hope, because it meant he wasn't dead. This would be the only opportunity to address the addiction that was driving my brother to his grave.

I flew out on the first red eye after Chet's indictment to be at his arraignment. One of my closest friends is a former Assistant U.S. Attorney, so I was able to confide in him my grave concerns about my brother's addiction and he was able to advise me on how to handle this situation to serve my brother's best interests. It's why, in a highly unconventional move, I met with the prosecutor to express my concerns about my brother getting released without going directly into lockdown rehab and with an ankle bracelet. I'm almost certain he would've overdosed had those conditions not been made part of his bail.

This would mark one of the most painful chapters in both of our lives. I couldn't sleep knowing my brother was locked down inside MDC Brooklyn, while I worked tirelessly to get him accepted into a topflight psychiatric facility that treats drug and alcohol addiction. This was no small feat given facilities' resistance to admit Chet knowing his medical history and that he was under federal indictment. The severity of his addiction cannot be understated: he was saying after his arrest that he had ALS, something manifestly untrue, because he thought that was the only way he could still get his hands on opioids.

It took 29 days before I was able to secure successful treatment into a psychiatric facility. He was discharged early, and I pleaded for them to keep him. The director of the facility told me that if I flew out to meet in person, they'd let me make a case on his behalf, but when I arrived in Arizona, they recanted the meeting. Their true aim was to release Chet into my custody, and I had no idea where I was going to take him.

When I picked him up, I discovered that they were still treating my brother with opioids, which I thought was nothing short of medical malpractice. The only thing they had left my brother with was an address for a pharmacy to pick up opioids. My patience had been exhausted, my limits tested, and my anger was explosive. There was simply no way I was driving 40 miles to pick up the very substance that had played a seminal role creating these circumstances in the first place. Shortly after departing the facility, my brother had a full psychotic episode, not unlike the very worst I had seen from my grandmother. From my mother. He nearly leapt from the car at 80 MPH on a scorched Arizona highway. I truly had no idea what to do, so we pulled over. I knew that I couldn't explain this adequately, so I recorded a video capturing a portion of his psychotic episode. He was a terrified, helpless, a scared little boy. I wondered what my dad would've done for him. I tried my best.

We spent the rest of the night driving around Phoenix attempting to secure admittance at a psychiatric hospital. None had the capacity to treat his very complex diagnosis. Bi-Polar Disorder. Opioids Abuse. CMT. The last facility recommended UCLA. My psychiatrist is on the board of Child Psychiatry at UCLA, but it was 3am. I was prepared to drive him directly, but he had an ankle bracelet, and I certainly didn't want to get picked up by U.S. Marshals on the 10 near Barstow. And the following morning Chet had a hearing with his pre-trial judge. He was

catatonic, experiencing massive opioid withdrawals, and the court gave me 48 hours to transport Chet and get him secured in another facility.

This process played out repeatedly. It ripped my life apart.

But something started to change in late October/early November. Chet found a psychologist that was able to get him to surrender to his diagnosis. Accept the things he cannot control. He is on time to everything. He's free of opioids. Underneath all of Chet's mental illness, is a kind of brilliance, not unlike my father's. The change from the day he was taken into custody in late April to now is measurable. He's coherent. He's humble. He's honest. And for the first time in as long as I can remember, he's sober. He's my brother again.

When I think about the possibilities for Chet's next chapter, my instinct is to lean into his greatest gift, his ability to read people. We spoke recently with an optimistic view about his future, spoke about what might be possible, and he said working in treatment. I asked if he considered getting a degree in psychology. He pondered, then a glow began to light from within, "Yes, I rather like that idea." My brother's suffered enough pain and tragedy for many lifetimes. I can't think of a better way for Chet to harness the burden of immeasurable pain into a force for good.

I don't know what I can say to influence Your Honor's decision about Chet's path forward, but I do know he's making progress. I do know that if he can maintain the work he is doing, Chet can find health, become a contributing member of society, and achieve my greatest hope for him: that his best days are ahead of him, not behind. That Chet's story… is one of redemption.


Best,
Paul Stojanovich Jr

# EXHIBIT B

February 15, 2023

Honorable Denise L. Cote
United States District Judge
500 Pearl Street
New York, NY 10007

Dear Judge Cote,

My name is Tamsin Measroch and I am Chet Stojanovich's fiancée. We live together in Irvine,
California, and we have two dogs together. I'm currently in school at Irvine Valley College
taking prerequisite courses before attending nursing school. I've known Chet for 11 years, since
we met through mutual friends at a New Year's Eve party in New York. In 2018, we moved in
together. Since his arrest, we've continued living together after he left inpatient treatment in
November.

When we first met, I was drawn to Chet by his caring nature. He is still one of those people who
goes out of his way to help others out of the kindness of his heart. I will never forget one of the
first times we hung out. I was at his apartment and the maintenance gentleman, Elio, showed up
to fix something in the kitchen. Chet greeted him at the door with a big hug and Elio said, "Hi
my friend!" They were chatting away and when the food arrived that Chet had ordered for
dinner, I noticed he had set the table for three, instead of two. Unfortunately, Elio was unable to
stay as he had another maintenance call that required his immediate attention. Chet ran to the
kitchen, grabbed some plastic containers, and packed Elio a plate of dinner so that he could eat
on the go. "Thank you, my friend, I have been working non-stop to make ends meet so that I can
afford a gift for my kid for Christmas," said Elio. Chet made a dash to his TV, where his new
PlayStation was set up that he had just unboxed. Chet stated, "Your boy loves video games,
right?" Chet rapidly disconnected his PlayStation, boxed it up, and handed it to Elio. Elio looked
at Chet and asked him why he would do this for someone he barely knew. Chet instantly
responded, "Every kid deserves a gift on Christmas."

This story is not the only example of Chet going out of his way to help others — he has helped
me tremendously with my self-image and self-esteem. ████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████



I remember when we started dating, I asked him about his family and for someone who is super talkative, he became very quiet. He told me his dad had passed away and he did not like to talk about it. When I found out what happened, I completely understood why this was a sore point for him. His dad had tragically fallen off a cliff in Oregon and nobody was able to locate him until his body was found nearly a month later about a mile from where he had fallen. My heart broke for Chet when I learned this. I could not imagine the amount of pain it must have caused him. Now, having known Chet for over a decade, I know this loss affects him on a daily basis. How does one cope with such a tragic death like that? Chet doesn't like to talk about his dad a lot as it upsets him and reminds him of that horrible day. He even finds it hard to look at photos of his dad.

This case has had a significant impact on Chet, emotionally, mentally, and physically. Chet has spent the last eight months in treatment both inpatient and outpatient. From conversations with Chet, I have witnessed his remorse, regret, and humiliation push him to move forward and work hard to be a model citizen and a contributing member of society. Treatment has also helped him to address his childhood trauma which has been a blessing. Since coming to treatment in California, Chet has abided by all the rules, become a healthier person, and proved to his family that he wants to make better choices.

As a result of his bond terms, he has not been allowed to go anywhere other than treatment and physical therapy and has been basically on house arrest on ankle monitoring which has been punishing in and of itself. Chet has Charcot Marie Tooth, a degenerative nerve disease; hereditary motor and sensory neuropathy. With this disease, Chet is supposed to be getting exercise each day, which he has not been able to do, which has caused his CMT to worsen. Additionally, the month Chet spent at the MDC deeply affected him. Before this case, I had only seen him cry once, about his father. At MDC, he called me crying often. These days, he tries to put on a brave face for me because he knows how devastated I am, but I can see he's terrified of

going back to jail. I truly hope that Your Honor will take into consideration his nearly a year of treatment and his health condition. I believe probation and community service would be more beneficial in his continued rehabilitation than incarceration.

I have seen so many positive changes that Chet has made since treatment. He has shown that treatment really works if you put the effort into it. Chet is calmer and gentler, when we have disagreements, I can see he processes our conversations better and is more understanding. Over the past month he has started going to physical therapy which is helping tremendously and ordered by his neurologist. He is attending outpatient three days a week as well as meeting with his therapist at the treatment center.

He has found so much purpose from treatment that Chet wants to become a counselor to help others, the way he's been helped this year. He's spoken with his current providers and knows he must get his Registered Alcohol and Drug Technician (RADT-I) certification to be a program counselor in California. The first step towards this is finishing his high school diploma, which he wasn't able to do as he had left school when his dad passed and that left him with a few classes to finish. These days, anybody can do their GED online and be done with it, but not Chet. Chet wants to finish what he started the right way. Today, he had his first class at the Irvine Adult School at Creekside Education Center to finish his degree. I could not be prouder of him.

I plan to do everything in my power to continue to push Chet in the right direction by showing him love, compassion, and encouragement. I am really proud of the person Chet has become over the last eight months and look forward to watching him continue to grow each and every day. I want to thank you for your time, Judge Cote, in reading this letter. I hope you will give Chet the chance to show he can contribute favorably to society.

Kind Regards,


Tamsin Measroch

# EXHIBIT C

████████████
Laguna Hills, CA ████

January 3, 2023

Dear Judge Denise L. Cote,

Thank you for the opportunity to submit a statement of support on behalf of Chet Stojanovich. I am the father of Tamsin Measroch, fiancée of Chet. I met Chet for the first time in August 2013. He was charming, talkative, and came across as a very smart individual. My first impression at lunch that day was of his genuine love for animals. He had an Australian Shepherd sitting on his lap, tucked under his arm, and when I inquired why he didn't place the dog on the floor while eating, he responded that he just loved holding his puppy. That left me with an understanding of his level of compassion and care, which transcended to his family, friends, and his now fiancée.

I had a clear recollection of our first get together, inquiring about his late father, and my daughter nudged and cautioned me discreetly not to pursue that question. I witnessed the sadness on his face, and I said it was ok to leave that discussion for another time. His father's passing was due to a tragic fall from a mountain, while hiking in Oregon. I continued this discussion with my daughter on another occasion, and came to understand that Chet was hugely impacted, not only by his father's death, but more so around the circumstances surrounding his death. This significant loss was traumatic for him, and any unrelated conversation regarding death, family loss or Oregon had to be navigated carefully, to not cause him any unnecessary distress.

During 2020, ████████████████████████████████████████ ████████████████████████████████████ left me home bound for nearly two years. It is a natural instinct for a daughter to be concerned about her father, and my daughter used to call me twice daily to inquire about my health progress. Chet was only her boyfriend at the time; however he made every opportunity to jump on the call too. His care, compassion and kindness were beyond comprehension.

To be honest, I was blindsided when he was arrested, as my daughter was engaged to him too, and am still in disbelief about the situation to this day. My shock was because this was not the Chet I knew. I'm neither a doctor nor a psychologist, but in my opinion his addiction to prescription pain medication was a culmination of his medical conditions and the trauma of losing his father. I feel comfortable stating that had there been some form of professional medical intervention via therapy at the time, perhaps these transgressions would have never occurred.

Why do I say this? After extensive in-house/outpatient rehabilitation, and based on the conversations I've encountered with Chet, I have seen the shame this has caused him, and his desire to move forward to a normal life.

I've had numerous conversations with my daughter, and she made the decision to support Chet through his ordeal. I have followed suit, and continue to support and have belief in Chet. I consider him a real gentleman, with a golden heart and compassion for others.

Since his indictment, he has been playing by the rules, is very humble and eager to prove that second chances work. I'm convinced that a conviction is already a huge punishment in his world and as a result of his various health disabilities - house arrest, community service and stringent probation would be more beneficial in his continued rehabilitation process versus incarceration.

While the Court is bound via legal guidelines, I honestly hope that the discretionary powers of Your Honor will be adopted to enable Chet Stojanovich to prove that he can be a model citizen and learn from the mistakes he has made.

Yours Truly,


Jeff Measroch

# EXHIBIT D

Rebecca Hatcher

██████████████

Huntington Beach, CA  █████

Sunday, February 12, 2023

Honorable Denise L. Cote
United States District Judge
500 Pearl Street
New York, NY 10007

To the honorable Judge Cote,

I am writing this letter in support of my friend, Chet Stojanovich. ██████████████
██████████████████████████████████████████████████████ I am an
educator and the mother of three children. ██████████████████████████████
██████████████████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████ While
I may not have known Chet a very long time, I can say that I know him as well as anyone could,
having spent almost all day, every day with him for three months. We continue to be friends
██████████████ to this day. I have listened to Chet process his trauma and emotions, and I
have had ample opportunity to observe and interact with Chet ██████████████████████████
███████. I cannot speak to Chet's character prior to ██████████████, but I can speak to the
kind of man that he has become while in treatment, and the man that he is now.

More than anything else, I know Chet to be characterized by compassion, kindness, and service
towards the people around him. Over and over again, I watched Chet take other ██████ under
his wing, care for them, and invest his time and energy in them. Chet cared especially for the
young adults ██████████████ who were struggling ██████████████. He spent time with them and
genuinely cared about their problems, and over time, everyone at the residence came to call
him "dad." Chet went out of his way to create and foster community within the residence.
██████████ can be intimidating and lonely, especially for new residents and young adults. Chet
facilitated group dinners, Sunday beach days, card games, and movie nights, despite the
limitation of being under house arrest in his unit. He made a point of inviting new or shy
residents to join social events so that they could make friendships and feel included. One of the
residents had no means of buying groceries for herself and nothing to eat except breakfast
cereal. Chet cooked dinner for her, and anyone else who was hungry, almost every night, even
with limited means.

Chet was also especially compassionate and understanding to people ██████████████ with more
severe psychological problems. The types of disorders they were dealing with are often very

stigmatized, and many of these people spent their time alone in their rooms. Chet took special care to invite and include them to participate in the community, and he unfailingly treated them with kindness and understanding. A mutual friend ███████████ said to both Chet and me that Chet was the first person she met ███████████ that made her feel seen as a person, not a diagnosis.

I personally found great support in Chet, ████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████ I found a lot of inspiration and hope from Chet's example; his health issues are significantly worse than mine, but he bears them with such grace and perspective. Of all the patients at Nsight, Chet demonstrated the most maturity and insight, despite the extremely difficult health issues life has given him.

Chet was just endlessly kind to everyone around him. I cannot think of a single instance when Chet was anything other than kind, and I don't think that there was ever any direct benefit to him.  He didn't receive any sort of reward or benefit ████████████████. I think that Chet's generosity and investment in others was largely invisible ████████████████████████████
██████████████████████████████. Chet's generosity and acts of compassion often required a significant amount effort and investment, as well as numerous negotiations with ██████████████ his parole officer. It is my firm belief that Chet did all these things because he genuinely cared for the welfare of the people around him, and that he valued their wellbeing.

████████████████████████████████, I have only seen Chet continue in his care and compassion for the people he met ████████████. He regularly keeps in contact with them, and checks up with them, offering them support and friendship. I respect the person that I have seen during the time that I have known him, and I am proud to say that I am his friend.


Sincerely,


Rebecca Hatcher

# EXHIBIT E



**T.R.U.S.T. SoCal**
1651 E. 4th St., Suite 120
Santa Ana, CA 92701
(657) 231-6200
info@trustsocal.com

February 15, 2023

RE:      STOJANOVICH, Chet - DOB ███/1984
TO:      The Honorable Denise L. Cote
FROM:  Eric Burk, LMFT, Clinical Director, TRUST SoCal

Dear Judge Cote,

Chet Stojanovich is currently enrolled in TRUST SoCal Adult Mental Health Program here in California. He is diagnosed with bipolar I disorder, generalized anxiety disorder, and posttraumatic stress disorder. He is receiving concurrent treatment for all three conditions. He joined on 11/09/22 and attends the program three days a week.

Treatment consists of 9 hours of group therapy per week, one hour of individual psychotherapy (with me), biweekly meetings with a psychiatrist, and case management services to assist with coordination of care. Mr. Stojanovich has attended the program every scheduled day since his enrollment apart from a single excused absence on November 28th due to a required court appearance in New York. He arrives on time and follows all instructions from his doctor and other members of his treatment team.

Treatment has focused primarily on Mr. Stojanovich's bipolar disorder for two reasons:

1. The disorder is characterized by manic episodes during which persons afflicted with the illness have an exaggerated sense of self-confidence, overestimate their abilities, take on projects that are too complex or ambitious for them to complete, and engage in uncharacteristic risk-taking. Episodes are marked by increased impulsivity and impaired judgment; if untreated, they can escalate into psychosis. Legal issues and significant impairments in social and occupational functioning are common.

2. Like dementia and schizophrenia, bipolar disorder is characterized by a lack of insight (anosognosia) which prevents individuals from recognizing symptoms that are clear to others. One of the greatest challenges in treating the disorder is convincing patients they have it; if this can be accomplished, they must then be taught how to manage an illness that will always be invisible to them.

During Mr. Stojanovich's first enrollment with TRUST (7/12/22 to 8/24/22), he rarely mentioned the illness and his treatment team only became aware of its existence and severity through conversations with family members. During the current enrollment, however, he has come to accept that he does in fact have bipolar disorder and has been fully cooperative with his team's efforts to teach him the skills necessary to manage it. He has learned to recognize the early warning signs of an impending manic episode as the illness manifests in him, and has developed a game plan for what to do if any of these warning signs are observed – what to do, who to call and in what order, etc. This is a critical skill that will enable him to limit the severity of future manic episodes and possibly avoid them altogether. He also acknowledges the importance of consistently taking whatever medications his doctor prescribes to stabilize his mood and makes no changes in his med regimen without consulting his doctor and obtaining his approval.

I have no way of determining the extent to which bipolar disorder has affected Mr. Stojanovich's behavior over the past 18 months; it may have had a profound impact if multiple episodes of mania were involved, but I do not know whether that was the case. Given the nature of the illness it is unlikely even Mr. Stojanovich would know. But I can confirm to the court that he now has the skills necessary to effectively manage the illness and dramatically reduce his risk of relapse, and has begun using them successfully.

I can also confirm that the experiences Mr. Stojanovich has had over the past year – wearing a GPS monitor, having his movements severely restricted, being unable to work, and facing the prospect of going back to prison – have been highly distressing to him. So much so that I consider it highly unlikely he will ever commit another crime. Mr. Stojanovich has gained insight into his past behavior that put him in this position. When we discuss his future, he consistently expresses a desire to change paths entirely and to work in the field of human services, which I have come to believe is genuine. Group leaders report he is a pleasure to have in their groups because of the empathy and concern he shows for other clients – in particular his willingness to listen rather than talk.

Mr. Stojanovich has made significant gains to date and he can expect to make continued progress in treatment. I am aware that he may be sentenced to prison time for his offense. Speaking only in terms of Mr. Stojanovich's mental health, imprisonment would be highly detrimental. Mr. Stojanovich is diagnosed not only with bipolar I disorder but also anxiety disorder and PTSD. He suffers from nightmares, hypervigilance, hypersensitivity, and dissociative episodes related to the month he spent in federal custody in Brooklyn. He has severe anxiety that sometimes escalates into panic attacks. I have 23 years of experience working exclusively with clients diagnosed with severe and persistent mental illnesses, and it is my opinion that Mr. Stojanovich will forfeit most or all of the gains he has made in treatment and regress further if he is removed from treatment and returned to prison.

Respectfully,

Eric Burk, LMFT
Clinical Director, TRUST SoCal MHP
(714) 220-7730